J-S05031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1364 WDA 2023 |

Appeal from the Order Entered October 19, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000046-2023

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: March 7, 2024**

S.W. (Mother) appeals from the order entered October 19, 2023, that granted the petition filed by the Allegheny County Office of Children, Youth and Families (Agency) to involuntarily terminate Mother's parental rights to T.H. (Child), born in May of 2019, pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After review, we affirm.

In her brief, Mother sets forth the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

---

[1] Notably, the Agency has been involved with this family since March of 2021, when it received reports concerning domestic violence against both Mother and Child. Additionally, Father's parental rights were terminated and he did not appeal.

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 6.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 958 A.2d at 276. Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Jennifer McCrady of the Court of Common Pleas of Allegheny County, filed on December 15, 2023. We conclude that Judge McCrady's well-reasoned opinion properly disposes of the issues raised by Mother.[2] Specifically, the trial court extensively discusses the testimony provided at the various hearings held in this matter, including information about Child's special needs and the many referrals and services provided throughout this case for both Mother and Child. Essentially, Mother's arguments center on challenging the trial court's findings that Agency had met its burden under 23 Pa.C.S. § 2511(a) and (b), and claiming that the record evidence does not support the termination of her parental rights. However, our standard of review prohibits this Court from overturning the trial court's findings so long as they are supported by the evidence. In this case, the court's determinations are supported by an overwhelming majority of the evidence. Accordingly, we adopt Judge

---

[2] While Judge McCrady suggests that waiver should be found due to Mother's vague concise statement, we decline to find waiver on this basis, as Judge McCrady was able to sufficiently address the merits of Mother's issues in her opinion. Thus, we do not endorse that limited aspect of her opinion.

McCrady's opinion as our own and affirm the order appealed from on that basis.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/7/2024

1-OPINION

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA
ORPHANS' COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF: T.H., a minor child, | : **CHILDREN'S FAST TRACK** |
| | : **APPEAL** |
| APPEAL OF: S.W... Natural Mother. | : |
| | : |
| | : AP No.: AP-0000046-2023 |
| | : 1142 WDA 2023 |
| | : |

Judge McCrady                                                December 12, 2023

Following a one-day hearing on October 12, 2023, this Court entered an order on October 19, 2023, terminating the parental rights of S.W. ("Mother") with respect to her son T.H. (DOB 5-26-19, "Child"). The Court found that grounds existed pursuant to 23 Pa. C.S. § 2511(a)(1), (2), (5), (8), and §2511(b). Mother was represented by counsel in the termination hearing and timely appealed this Court's order.[1] For the reasons set forth below, the Order of this Court terminating Mother's parental rights to the Child should be affirmed.

---

[1] Father's parental rights were terminated and Father did not appeal.

## RELEVANT FACTS

This Child (DOB 5/26/2019) first came to the attention of Allegheny County CYF on March 18, 2021. See Transcript of Testimony dated October 12, 2023 ("T.T.") at 70. CYF received a report that Mother had an altercation with a boyfriend and he almost hit Mother and her Child with his car. *Id.* CYF investigated the report and came to understand that Mother had experienced domestic violence in her current and past relationships. *Id.* On this occasion, Mother called the police but the boyfriend fled before their arrival. *Id.*

On April 2, 2021, CYF received a second report indicating that Mother had been brought to a local hospital via ambulance, alleging she had been sexually assaulted and her Child had been hit in the lip. *Id.* The hospital staff observed that the Child, approximately twenty-two months old, had a fat lip. *Id.* Police involved in the investigation observed a video depicting Mother and Child walking outside at 2:00 a.m., during which time the Child fell, and it was unclear whether the Child sustained his injury from being hit or from this fall. *Id.; see* CYF Exhibit 1 - Certified Dependency Orders (Order of Adjudication 10/6/21). Later, when the CYF caseworker questioned Mother about this incident, she said she wasn't

2

assaulted and had no idea how the Child sustained the lip injury. *Id.* Mother reported she went to the hospital because of back pain. *Id.*

CYF opened the case for services April 23, 2021, and referred Mother to the Women's Center and Shelter for domestic violence programming. *Id.* at 71-72. On May 5, 2021, CYF provided Mother with in-home services to help address any parenting concerns, connect Mother with mental health and disability services, locate housing, and to ensure her young Child received developmental services for his autism. *Id.* at 72-73. CYF scheduled the first teaming meeting with Mother on May 24, 2021. *Id.* at 73; *see also* CYF Exhibit 2 - Family Plans. At the meeting, Mother admitted to smoking marijuana. *Id.* at 73. CYF made a referral for Mother to receive a drug and alcohol assessment through POWER[2]. *Id.* That same day, Mother made suicidal threats. *Id.* Resolve was called and Mother was transported to the Western Pennsylvania Institute and Clinic ("WPIC").[3] *Id.* Mother was

---

[2] POWER stands for Pittsburgh Organization for Women in Early Recovery. POWER is a local organization that provides drug and alcohol assessments for individuals struggling with substance abuse, as well other services such as referrals for treatment and ongoing mentorship support.

[3] Resolve Crisis Network ("Resolve") is a free service available to all Allegheny County residents. Resolve has mobile crisis teams available to assist with stabilization or intervention, as well as crisis support and referrals for individuals in need of services. Western Psychiatric Institute and Clinic ("WPIC") is the mental health hospital affiliated with UPMC health network and provides emergency mental health assessments, and if warranted, psychiatric admission and treatment, or referrals for appropriate outpatient treatment and programming.

evaluated at WPIC and instead of hospitalization was recommended for intensive outpatient therapy. *Id.*

On June 11, 2021, Mother told the CYF caseworker about a recent incident at a friend's home in North Braddock, where the police were called because "her friends were hitting her." *Id.* at 74. Mother, who had the Child with her at that time, was told by the police she should go home. *Id.* Mother was observed to have a black eye the following month and stated she received it from falling down steps. *Id.* Mother later admitted that the black eye was a result of fighting with her boyfriend. *Id.*

CYF filed a petition for dependency on July 29, 2021. *Id.* at 74. Shortly thereafter, CYF received yet another report that Mother and her boyfriend were hitting each other and engaged in domestic violence. *Id.* Mother never participated with the domestic violence programming and did not complete the POWER drug and alcohol assessment that the agency made referrals to in May 2021, and as a result, both programs closed out unsuccessfully. *Id.* CYF made new referrals to both programs on August 16th and 17th, 2021. *Id.* at 74-75. CYF received reports that police were called to Mother's home on August 20, 2021, and September 28, 2021, for allegations of domestic violence between Mother and her boyfriend. *Id.* Again, during these incidents, the Child was present and in Mother's care.

4

At the adjudication hearing on October 6, 2021, the Court heard extensive testimony and evidence with respect to Mother. CYF Exhibit 1 - Certified Dependency Orders (Order of Adjudication 10/6/21). The Court made several findings as to the ongoing domestic violence, the lack of follow through with services, and lack of treatment the Child was receiving for his autism while in Mother's care. *Id.* The Court removed the Child from Mother's care and gave CYF permission to place with an appropriate relative or in an appropriate foster home. *Id.* Mother was ordered to comply with her mental health treatment, participate in visitation, address parenting skills, engage in domestic violence programming, cooperate with in-home services, and assist her child in obtaining the necessary autism services and therapy. *Id*; see also T.T. at 76. The order provided for supervised visitation, which could be supervised by an appropriate relative and which could be further modified in scope and location after Mother completed a parenting assessment. *Id.*

The Child was briefly and unsuccessfully placed into two separate homes, with one being a maternal great aunt. CYF Exhibit 1 - Certified Dependency Orders - Order Granting Motion October 13, 2021; see also Permanency Review Order ("P.R.O.") 12/2/21. Neither placement could maintain the Child and his

5

special needs, and on October 15, 2021, the Child was placed into the non-relative, Three Rivers Adoption Council ("TRAC") foster home of ~~⬛⬛⬛⬛⬛⬛⬛⬛~~ *A. G.*.[4]

The extent of the Child's special needs quickly became evident to the Court, and all parties after his adjudication. This Court presided at permanency review hearings on: 12/3/21, 2/22/22, 5/4/22, 9/28/22, 12/14/22, and 2/15/23. Within these orders, this Court made findings, *inter alia*, about the Child's special needs, such as: the Child requires twenty-four hour supervision; the child has significant tantrums; an assessment in November 2021 at the Child Development Unit confirmed the autism diagnosis; the Child only sleeps three hours each night; the Child requires multiple developmental services through early intervention, specifically, speech therapy, occupational therapy, and coached communication speech therapy; the Child was prescribed intensive behavioral health services; the Child needed a sleep study; the Child has an Individualized Education Plan ("IEP")

---

[4] Mother is hearing impaired. American Sign Language ("ASL") interpreters were provided at each hearing, specifically, one interpreter for her to be able to communicate confidentially with her counsel, and at least one to two additional interpreters, who would take turns signing during the hearing. These interpreters were provided regardless of whether Mother attended in person or virtually. In their work with Mother, the CYF caseworker supervisor testified that they would either use an ASL interpreter, when available, or communicate with Mother by texting. T.T. at 86-87. At the time of placement, the Child was two years old and non-verbal, with a diagnosis of autism. This Court found it extraordinary that not only was the agency able to locate a foster home willing to house a child with such significant behavioral health needs but one who was also fluent in ASL, as Ms. Gordon has an associate degree in interpreting for the hearing impaired.

for his Pre-K Counts program; and the Child is on the waiting list to receive specialized Applied Behavioral Therapy. See generally CYF Exhibit 1 - Certified Court Orders, P.R.O. 12/2/21, 2/23/22, 5/4/22, 9/29/22, 12/14/22, and 2/14/23.

CYF provided Mother with a multitude of referrals and services throughout the pendency of the case, which is evidenced and reflected within the documentation of the CYF teaming meetings. See CYF Exhibit 2 - Family Plans. In many instances, CYF provided multiple referrals for services after Mother's lack of participation required the service to close out. Mother was referred to domestic violence programming at the Women's Center and Shelter, referred for a drug and alcohol assessment at Power, connected her with individual mental health outpatient services through Mercy Behavioral Health, provided parenting skills through Holy Family and in-home services to assist with managing appointments, referred her to Achieva, and utilized visitation supervision through TRAC. Mother was given monthly bus passes to assist with transportation, and either CYF or the foster care agency provided all transportation for the Child's visits and medical or therapeutic appointments. *Id.* From the adjudication order, this Court ordered that Mother have supervised visits three times each week and yet Mother asked that her visits be reduced to only twice each week, indicating she would ask for the third visit when she felt ready. *Id.* Mother self-reported that when she was in school, she was involved in special education programming, and CYF encouraged Mother

to utilize and work with the in-home services in completing any paperwork that would register for her disability services in the county. *Id.*

The Court also made specific findings in each permanency review order and provided clear direction as to what Mother needed to address to remedy the conditions that necessitated placement. At the first permanency review hearing after the adjudication, the Court found that Mother made progress in attending three domestic violence classes and having her boyfriend move out of her home. CYF Exhibit 1 - Certified Dependency Orders, P.R.O. 12/3/21. Mother also had attended more visits than she missed: however, there were concerns that she was on her phone during visits and she was disengaged with her Child. *Id.* At the following permanency review hearing in February 2022, the Court made findings that Mother was recently observed with a black eye and missing hair. *Id.* at P.R.O. 2/23/23. Mother indicated that her boyfriend was back in the residence, and he was taking her bus pass and phone. *Id.* Mother obtained a new residence with only her name on the lease in early February 2022. *Id.* Mother was discharged from her mental health treatment due to non-compliance. *Id.* Mother had not made herself available for her Child's developmental appointments. *Id.* Mother had not worked with Holy Family on parenting since November 2021, and she missed two appointments with Achieva, which was another parenting program put in to help with reunification. *Id.* Mother only visited with her child twice that

8

reporting period and indicated that visits three times a week is too much for her, asking for visits to be reduced to twice weekly, supervised. *Id.* At the few visits Mother did attend, it was observed that her boyfriend was driving her there. *Id.*

At the May 2022 permanency review hearing, the Court made findings that Mother had again obtained new housing and was living alone. *Id.* at P.R.O. 5/4/22. The Court noted that Mother had made some progress by re-engaging with the domestic violence program, her mental health treatment, and parenting instruction. *Id.* Additionally, Mother attended some developmental appointments for her Child but only attended seven of the sixteen possible visits that reporting period. *Id.* However, by the September 2022 permanency review hearing, much of the progress Mother had previously made had dissipated. The Court found that Mother stopped attending her mental health treatment in May 2022 and did not resume until the end of August 2022, with the explanation that she was "too busy." *Id.* at P.R.O. 9/28/22. Since the last hearing, Mother lost her housing. *Id.* There was an incident where a fugitive was in her home and the SWAT team responded, as well as issues with her house guests and allegations of marijuana use. *Id.* Mother obtained new housing at the beginning of September but the heat had yet to be turned on. *Id.* Mother testified she was the only one on this new lease. *Id.* Mother had only attended four of a possible forty visits that reporting period, providing the explanation that she was busy and unable to attend visits. *Id.*

9

In June 2022, Holy Family, which had been providing parenting programming and support for Mother, closed out unsuccessfully. T.T. at 93. Mother never followed through with attending the sessions necessary to receive parenting support from Achieva. *Id.*

At the December 2022 permanency review hearing, the Court made findings that Mother attended a total of four visits with her Child. *Id.* at P.R.O. 12/14/22. Mother had attended two mental health counseling sessions this reporting period. *Id.* Mother was not attending or engaging with her Child's service providers and wasn't responding to the caseworker when contacted. *Id.* Mother tested positive for THC at the September hearing. *Id.* Mother, who had not been attending urine screens, also declined a POWER assessment. *Id.* While CYF assessed Mother's new residence to be appropriate, it was noted that there was a boyfriend residing in the home with her. *Id.*

On February 6, 2023, Mother completed a POWER assessment, which recommended "1.0 co-occurring outpatient treatment." T.T. at 98-99. CYF and the Court never received any evidence or testimony that Mother followed through with obtaining this recommended treatment. *Id.*

By the February 15, 2023, permanency review hearing, other than completing the ten-session domestic violence program through Women's Center and Shelter, Mother had not made any progress in addressing her goals or in

10

remedying the conditions that necessitated removal. The Court scheduled a goal change hearing to occur on April 5, 2023, and set the next permanency review hearing for May 24, 2023. CYF Exhibit 1 - Certified Dependency Orders, P.R.O. 2/15/23. Mother's mental health provider once again closed out due to no contact. *Id.* Mother failed to attend any of the Child's medical or special education meetings during that reporting period. *Id.* Mother completed an assessment with POWER on February 6, 2023, referenced above. *Id.* Notably, Mother told the evaluator at that assessment that she was still involved in her mental health counseling despite that being untrue. *Id.* The assessment indicated a sign of relapse. *Id.* During this period, Mother continued to reside in the housing with her new boyfriend and failed to attend a single supervised visit with her Child, with her last visit occurring on October 20, 2022. *Id.*

CYF filed a Petition to Involuntarily Terminate Mother's Parental Rights on March 6, 2023. T.T. at 78. The Court scheduled the initial contested termination of parental rights proceeding and permanency review hearing to occur on July 17, 2023. CYF Exhibit 1 - Certified Dependency Orders. Mother failed to show up for her individual evaluation with the court appointed evaluator on June 6, 2023, and Mother canceled her interactional evaluation with her Child scheduled for June 12, 2023. CYF requested a continuance of the contested termination of parental

11

rights hearing to allow Mother the opportunity to attend both rescheduled evaluations and the case was continued to October 12, 2023.

At the time of the contested termination proceeding, the Child had spent over twenty-four consecutive months out of the care of his Mother. Not quite four and a half years old, this special needs Child spent two years in the care of his current placement, with A. G.

Nicole Butterfield, the TRAC foster care caseworker assigned to the case, explained her responsibilities, stating, "I do biweekly home visits with [the Child]. And I am the custodian of record. I do most of the visits with [the Child]. And every piece of documentation that comes in about [the Child], whether it's a school report, medical report or a visit note from one of my colleagues, I see it and enter it into KIDS." T.T. at 41. With respect to Mother's visitation, Ms. Butterfield testified that Mother has attended thirty-nine (39) out of a total of one hundred and fifty (150) visits throughout the entire case. *Id.* at 44. Ms. Butterfield clearly explained that of these missed visits she was not including any visits where the Child could not attend because he was sick. *Id.* She further testified that Mother has given various reasons for why she wasn't attending her visits, stating, "Most of the time it has been too cold or she is sick and has been in the ER. Or a couple of times it has not been a good time today. And there have been occasions where she just has not confirmed." *Id.* at 45. Ms. Butterfield testified that due to Mother's

12

inconsistencies with the visits, and because they are transporting the Child to each visit, that Mother is required to confirm the day before and show up in advance so that they do not transport the Child unnecessarily. *Id.* at 45.

Mother's mental health counselor, Val Morschl, from Mercy Behavioral Health ("MBH"), provided a letter detailing Mother's sporadic attendance since September 2021. CYF Exhibit 4 - Letter from MBH. Ms. Morschl, trained in ASL, indicated that Mother attended nine appointments and canceled or no-showed five appointments between September 2021 to February 2022. *Id.* Mother was closed out with MBH on February 17, 2022. *Id.* Mother reengaged in counseling sessions with Ms. Morschl from April 2022 to November 2022, attending a total of twelve counseling sessions. *Id.* Ms. Morschl notes that Mother did not respond to attempts to schedule in June or July 2022, did not respond to attempts to schedule between September 12, 2022 - October 19, 2022, canceled two sessions in December 2022, and did not respond to Ms. Morschl's attempts to reschedule. *Id.* As a result, other was again closed out by MBH for a second time on January 18, 2023. *Id.* Mother contacted Ms. Morschl on July 20, 2023, and asked to have her case reopened but Mother canceled two intake appointments on August 15, 2023, and September 12, 2023. *Id.* Mother ultimately attended an intake appointment on September 20, 2023, and had a session on October 2, 2023. *Id.*

13

Ms. Morschl testified at the termination proceeding that Mother is diagnosed with major depressive disorder and she would like Mother to attend weekly outpatient therapy. T.T. at 10. Ms. Morschl also testified that Mother's attendance, as evidenced in her letter, was inconsistent and Mother has made "minimal progress. It has not been marked or substantial." *Id.* at 12.

Dr. Gregory Lobb, the Court appointed evaluator, testified about the evaluations he completed and provided a report with his findings. T.T. at 20; *see also* CYF Exhibit 3 - Dr. Lobb's Report. Dr. Lobb testified that his interactional with the Child and A.G., the TRAC foster mother, occurred on June 7, 2023. *Id.* at 20. Dr. Lobb tested that the Child, diagnosed with autism, is "an active child. He is busy." *Id.* at 22. Dr. Lobb found the foster mother to be "very engaged with him", "very attentive to him and recognized his needs", and that she "provided positive praise to him." *Id.* Dr. Lobb stated that he observed the foster mother to redirect him by sitting him on the couch and explaining to him that he needed to listen to her. *Id.* He observed that the foster mother "talked with [the Child] constantly throughout the interactional evaluation." *Id.* Dr. Lobb stated that the Child has a secure attachment with the foster mother, that she is very in tune with his needs, and that the Child recognizes her as the person who takes care of him. *Id.* at 23. Dr. Lobb noted that he has been with her for some time and there was a strong bond. *Id.* at 24. Of relevance, Dr. Lobb stated that because of

14

the Child's autism, having consistency, structure, and stability are important, and "breaking a bond like that would be very difficult for him." *Id.*

Dr. Lobb testified that he conducted an interactional evaluation between the Mother and Child on August 22, 2023, and he observed that Mother attempted to be engaged with her Child during the assessment. *Id.* at 24. Dr. Lobb testified that the Child "was much less responsive to her. He often pulled away from her, he turned his back on her, he would move toys further away from her across the room. And that was consistent. He did that multiple times during the interactional evaluation." *Id.* at 24-25. Dr. Lobb stated that Mom was responsive when he was jumping on the couch and recognized it was a safety issue. *Id.* Dr. Lobb also observed the Child reciprocate a hug with Mother but also stated that part of his autism responds to being soothed that way. *Id.* Ultimately, Dr. Lobb found that while Mother tried to engage with her Child, he was not accepting and pulled away from her during the interactional. *Id.* Dr. Lobb testified, "I'd say he has what I would call an ambivalent anxious attachment with her. I think this is the result of sort of inconsistency." *Id.* at 26. He continued, "I do not think they have a bond." *Id.*

Dr. Lobb opined that he did not think there would be a negative effect on the Child if Mother's rights were terminated, and when asked to elaborate, he stated, "Like I said, I think that he is familiar with [Mother]. You know, he sees her for

15

visits. He knows who she is. They do things, play, visits, those kinds of things I'm sure. But he does not look to her as a primary parental figure or somebody who meets his day to day needs." *Id.* at 27. Dr. Lobb recommended that the Child be adopted and testified that this was in his best interests because for this Child "consistency, structure, stability, those things are very important for a child with autism." *Id.* at 28.

Dr. Lobb was unable to render any opinion on Mother's current mental health or diagnosis, noting that Mother was scheduled for an individual evaluation on June 6, 2023, but she did not show. *Id.* at 30. Dr. Lobb testified that another individual evaluation was scheduled for Mother on September 6, 2023, but she did not show. *Id.* Dr. Lobb also confirmed that an interpreter was present for Mother's interactional and that the presence or use of the interpreter did not have any limitation on his ability to assess their interaction. *Id.* at 31.

Mother appeared and was represented by counsel at the termination proceeding. She testified that she does not have a problem with alcohol and the last time she smoked marijuana was December of 2021. *Id.* at 103. Mother testified that she didn't attend her mental health counseling because her bus pass expired or she was sick. *Id.* at 104. Mother clarified that it was not a boyfriend that injured the Child's lip but rather a friend she asked for a ride. *Id.* at 105. When it came to explaining why she missed so many scheduled visits with her Child, Mother stated

16

"Sometimes I was sick. Sometimes I had lost my bus pass or expired. Also my phone had broken at one point." *Id.* at 106. Mother stated that she was unemployed and had not worked since July 2023. *Id.* Mother admitted that she did not have what would be necessary to keep the Child safe in her apartment, other than a gate, but thought she could acquire those necessary items. *Id.* at 107.

Mother acknowledged that there were providers in place that knew and utilized ASL, for example, her mental health counselor and the Child's foster mother. *Id.* at 108. At her domestic violence program through Women's Center and Shelter, Mother testified that there was a VRI interpreter, which she explained is when an interpreter is on video on the phone. *Id.* at 108. With respect to the parenting skills offered to her through Holy Family, Mother said that an interpreter wasn't there a hundred percent of the time and when the interpreter was not there, they would text. *Id.* at 108. Mother indicated a preference for an interpreter rather than texting with the foster care caseworker during her supervised visits. *Id.* at 109. Mother was unable to provide any credible explanation for the large gaps in her mental health therapy. *Id.* at 112. When asked if she could care for her Child if he was placed into her care, Mother stated "Sometimes — yes. But there are some things. [The Child] does get upset easily. He will hit and spit and pour things out. So stuff like that, it is hard for me to handle." *Id.* at 109.

17

Mother did not enter any evidence into the record, and the only witness she presented was her own testimony.

## STANDARD

The standard for review in termination cases is well established and our appellate courts will accept the findings of fact and credibility determinations of the trial court if they are supported by the record. Adoption of C.J.P., 114 A.3d 1046, 1049 (Pa.Super. 2015). The trial court may be reversed upon a finding of an error of law or abuse of discretion. An abuse of discretion is defined as manifest unreasonableness, partiality, prejudice, bias, or ill-will and not a circumstance where the record would support a different result. *Id.* Trial Courts are afforded a particular deference because of their first hand observations of the parties for proceedings that may span multiple hearings. *Id.*

In the instant matter, CYF filed a petition to terminate Mother's parental rights pursuant to 23 Pa. C.S. §2511 (a)(1), (a)(2), (a)(5), and (a)(8). These subsections provide for the involuntary termination of parental rights if the petitioner can establish by clear and convincing evidence that:

(a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties [...]

18

(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. [...]

(a)(5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

(a)(8) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa. C.S. §2511 (a)(1), (a)(2), (a)(5), and (a)(8). Once the statutory grounds for involuntary termination of parental rights have been shown by clear and

convincing evidence, the Court must consider whether the termination would meet the needs and welfare of the child under subsection § 2511(b):

> (b) Other considerations. – The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa. C.S. § 2511(b). In relevant part, § 2511(b) requires the court to give "primary consideration to the developmental, physical and emotional needs and welfare of the child" when terminating the rights of a parent. As discussed by the Superior Court, the inquiry into whether termination best serves the child's needs and welfare includes the inquiry to the nature and status of any bond between the parent and the child, and the effect on the child of severing that bond, if it exists. The trial court looks to the discussion in In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011), which states:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in

20

the best interest of the child. In re K.K.R.-S., 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. See In re T.D., 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where the court balanced strong emotional bond against the parents' inability to serve the needs of the child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." In the Adoption of T.B.B., 835 A.2d 387, 397 (Pa. Super. 2003).

Our Pennsylvania Supreme Court recently discussed the importance of the trial court's consideration of whether a bond was "necessary and beneficial" to a child in In the Interest of K.T., 296 A.3d 1085, 1113 (Pa. 2023), which stated:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm.

Within this decision, the Supreme Court acknowledged that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis. *Id.* at 62.

21

## DISCUSSION

Mother argues that this Court abused its discretion and/or erred when it terminated rights as to 23 Pa. C.S. § 2511 (a)(1), (a)(2), (a)(5), (a)(8) and §2511(b) as follows:

(1) The trial court abused its discretion and/or erred as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa. C.S. § 2511 (a)(1) (2), (5), and (8). There was not clear and convincing evidence that the repeated and continued incapacity, abuse, neglect or refusal of Mother caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and that the conditions and causes of any incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother. The conditions which led to the removal of the child either no longer exist or can be remedied within a reasonable period of time and termination of parental rights does not best serve the needs and welfare of the child.

(2) The trial court abused its discretion and/or erred as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa. C.S. §2511(b) when the record would not support such a conclusion. Furthermore, CYF did not meet its burden under 23 Pa. C.S. §2511(a) precluding the trial court from making a finding under 23 Pa. C.S. §2511(b).

See Mother's Concise Statement of Matters Complained of on Appeal.

The Court notes that Mother's Concise Statement merely paraphrases the relevant statutory language into the issue statements. The Pennsylvania Rules of

22

Appellate Procedure, specifically 1925(b)(4)(ii), requires an appellant to "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." This Court is aware of how significant it is to terminate someone's parental rights and understands the leeway afforded to parents who seek to appeal such decisions. However, when the Concise Statement of such an appeal is so utterly vague, it is next to impossible for the Court to know where the alleged errors and/or abuse of discretion occurred. As such, this Court believes that Mother's Concise Statement lacks the detail required by our appellate rules and should render her issues as waived.

However, should the Court determine that Mother's Concise Statement possesses "sufficient detail", the Court will attempt to address what is written within each issue. Mother's first issue:

There was not clear and convincing evidence that the repeated and continued incapacity, abuse, neglect or refusal of Mother caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and that the conditions and causes of any incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother. The conditions which led to the removal of the child either no longer exist or can be remedied within a reasonable period of time and

23

termination of parental rights does not best serve the needs and welfare of the child.

Mother's goals were to address domestic violence, mental health, drug and alcohol use, parenting, visitation, and cooperation and participation with her Child's autism services. Mother completed the Women's Center and Shelter domestic violence program. T.T. at 77. She participated in ten sessions, beginning on October 27, 2021, and ending on September 13, 2022.

Mother did not address her mental health goal. After being taken to WPIC via Resolve, she was recommended for intensive outpatient treatment, which she never enrolled in. CYF referred Mother for counseling at MBH, where she was assigned to a therapist who uses ASL, and she was closed out twice due to lack of contact.

Mother did not address her parenting goal. Mother was inconsistent with her involvement with the parenting classes and support being offered by Holy Family. Mother failed to attend two different assessments with Achieva, which was required to participate in their program. Mother did not provide any evidence or testimony about her progress, or lack thereof, with her parenting goal. Mother did not provide any evidence or testimony of any other parenting program she participated and/or completed during the pendency of this case.

Mother did not address her goal of cooperating and participating her Child's autism services. Mother did not provide any evidence or testimony to explain why she did not achieve or make progress on this goal. The foster mother was made secondary education and medical guardian on January 12, 2022, due to Mother's inconsistency and unavailability. The foster mother was made the primary education and medical guardian on December 15, 2022, due to Mother's overall lack of contact and interest.

Mother did not address her drug and alcohol goal. CYF referred Mother to POWER for an evaluation based on her disclosure of marijuana use in May 2021. POWER closed out due to no-contact. CYF re-referred Mother to POWER for an evaluation in August 2021, which again closed out. Mother completed a urine screen in September 2022, at which time she was positive for marijuana. Mother ultimately had a POWER evaluation on February 6, 2023, where she was recommended for 1.0 co-occurring treatment. CYF never received any evidence, nor did Mother present any testimony or evidence, that she engaged in the recommended treatment after that assessment.

Mother did not address her goal of visitation with her Child. After the Child was adjudicated dependent and removed from Mother's care, the Court ordered that Mother have three supervised visits each week, giving permission for approved relatives to supervise, and permission to alter the visitation schedule

based on the recommendation of a parenting program provider. The evidence and testimony before the Court was that Mother was not only inconsistent but would essentially disappear from seeing the Child for chunks of time over the two years he has been in care. The evidence and testimony was that Mother requested her visits be reduced from three times per week to twice per week. Mother was provided with transportation assistance in the form of bus passes, and her testimony was that she missed visitation with her child for a variety of reasons, including losing or having an expired bus pass, being sick, or being busy with other things. In the six months prior to the filing of the Petition to Involuntarily Terminate Mother's Parental Rights, she had seen her child one time, supervised. Moreover, the testimony from the visitation supervisors was that during some of Mother's supervised visits she struggled to engage her Child and spent time on her phone. Mother did not present any credible evidence or testimony to explain the lack of contact with her Child. Moreover, Mother's lack of regular, consistent visits with her Child was apparent to Dr. Lobb, the court appointed evaluator, who testified that the Child was merely familiar with Mother and had an ambivalent bond.

CYF held regular teaming meetings with Mother to ensure that she had the support necessary to address and understand what she needed to accomplish in order to remedy the conditions that led to removal. CYF Exhibit 2 - Family Plans.

The Court made detailed findings of fact in each of her orders in an effort to be abundantly clear as to the issues that were going on and what needed to be remedied. CYF Exhibit 1 - Certified Dependency Court Orders. Mother did not present any evidence or testimony to dispute any of the above.

Multiple witnesses, including the Court appointed evaluator, the CYF caseworker supervisor, and the TRAC foster care caseworker, all testified that termination would serve the best interests of this Child. Mother did not present any testimony or evidence to dispute this.

Therefore, it is this Court's opinion that the record was replete with uncontroverted evidence that CYF met their burden and clearly and convincingly proved that statutory grounds existed, and that termination best served the Child's needs and welfare.

The Court looks to Mother's second issue, as articulated in the Concise Statement:

> The trial court abused its discretion and/or erred as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa. C.S. §2511(b) when the record would not support such a conclusion. Furthermore, CYF did not meet its burden under 23 Pa. C.S. §2511(a) precluding the trial court from making a finding under 23 Pa. C.S. §2511(b).

The record yields one outcome in this case. CYF met its burden that termination of Mother's parental rights would best serve the needs and welfare of this Child pursuant to §2511(b). Simply put, there is no other conclusion this Court could reach.

The Court appointed evaluator, after conducting interactionals between the Child and Mother, and the Child and the foster mother, concluded that the foster mother is the Child's primary parent, to which he is attached and bonded. Dr. Lobb testified that the Child had an ambivalent bond towards Mother. As a result, termination of Mother's parental rights would not have an adverse impact on the Child. Furthermore, this Child has a diagnosis of autism, is involved in several services, and requires a heightened level of supervision that this foster home has been able to provide. The provision of both the tangibles and intangibles, including the much-needed permanency, meets his unique needs and welfare and is in his overall best interest. Termination and adoption was also recommended by the TRAC foster care caseworker, who attended biweekly visits in the foster home as well as supervised visits with Mother, based on her observations and knowledge of the Child's special needs.

Mother did not provide any evidence or testimony to challenge the sufficiency of this evidence.

With respect to the second part of this issue, the Court will not reiterate what has been fully addressed within the first issue, that is, the overwhelming evidence that grounds existed such that the Court could consider 23 Pa. C.S. §2511(b).

Therefore, for the reasons set forth in this Opinion, the decision of this Court should be affirmed.

BY THE COURT:

_____, J.